AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court

for the
Western District of New York

UNITED STATES DISTRICT COURT
FILED
OCT 13 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

United States of America

v.

DUT DOUR and
TOMMY PURDUE

*Defendants*

Case No. 26-mj-5242

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning in or about May 2025, the exact date being unknown, and continuing until on or about April 29, 2026, in the Western District of New York, and elsewhere, the defendants, **DUT DOUR** and **TOMMY PURDUE**, did knowingly and willfully combine, conspire, and agree together and with others, known and unknown, to ship, transport, transfer, cause to be transported, and otherwise dispose of firearms to another person, in or otherwise affecting interstate and foreign commerce, having reasonable cause to believe that the use, carrying, and possession of the firearms by the other person would constitute a felony.

**All in violation of Title 18, United States Code, Sections 933(a)(1) and 933(a)(3).**

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

Ralph Joseph

*Complainant's signature*

RALPH JOSEPH
Special Agent
Federal Bureau of Investigation

*Printed name and title*

Subscribed and sworn to telephonically.

Date: October ~~9~~ 13, 2026

Michael J. Roemer

*Judge's signature*

City and State: Buffalo, New York

HONORABLE MICHAEL J. ROEMER
United States Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK )
COUNTY OF ERIE ) ss:
CITY OF BUFFALO )

I, **Ralph Joseph**, Special Agent of the Federal Bureau of Investigation, being duly sworn, deposes and says:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed as Special Agent with the FBI since July 2019. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for racketeering and other crimes associated with organized crime. These investigations are conducted both overtly and covertly. I have participated in numerous organized crime, violent crime, narcotics, financial, and public corruption investigations. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. As a Special Agent, I attended the Basic Field Training Course at the FBI Academy in Quantico, Virginia. During this training, I received detailed training, both academic and practical application, in the areas of informant handling/debriefing, various

investigative techniques, and collection and processing of evidence. In addition, I received both academic and practical application training on surveillance and counter surveillance techniques/methods. I received legal instruction on various federal violations, constitutional amendments, relevant case law, preparing affidavits, Fourth Amendment Searches and Seizures, Federal Rules of Evidence, and the execution of search warrants.

3. Based on my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities. While participating in these investigations, I have reviewed and analyzed recorded conversations and records of drug traffickers and money launderers. Through training and experience, I am also familiar with many of the methods and techniques used by criminal organizations to launder and legitimize proceeds from illegal activity in an effort to avoid law enforcement detection and other government mandated reporting requirements.

4. Based on my training and experience, I am familiar with the techniques and methods used by illegal firearms traffickers. I have participated in and reviewed evidence from investigations involving the illegal trafficking of firearms. My investigative experience detailed herein, and the experience of other law enforcement agents who are participating in this investigation, serve as the basis for the opinions and conclusions set forth herein.

5. Your affiant makes this affidavit in support of a criminal complaint charging **DUT DOUR** (hereinafter "**DOUR**") and **TOMMY PURDUE** (hereinafter "**PURDUE**")

with violating Title 18, United States Code, Sections 933(a)(1) and 933(a)(3) (conspiracy to commit trafficking in firearms).

6. This affidavit is being submitted for a limited purpose, that is, a probable cause determination. Therefore, I have not presented all the facts of this investigation to date. I have only set forth only the information I believe to be necessary to establish probable cause. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from law enforcement officers and witnesses, as well as other law enforcement agency reports. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not set forth all of the knowledge of this matter.

## II. PROBABLE CAUSE

7. Starting in May 2025, the FBI and ATF Buffalo began conducting a criminal investigation of a firearms trafficking group based in and operating throughout the Western District of New York. Based on my training and experience, as well as information learned during the investigation, including physical surveillance, the FBI/ATF identified **DOUR** and **PURDUE** as firearms traffickers.

8. On or about August 11, 2025, FBI confidential human source ("CHS-1")[1] reported that **DOUR** traffics narcotics and firearms in the Buffalo, New York area. CHS-1 further indicated **DOUR** obtains firearms for straw purchases and other illegal means.

---

[1] CHS-1 is providing cooperation with the hope CHS-1 will receive a sentencing benefit.

9. On or about August 12, 2025, CHS-1 conversed via text message with **DOUR** and requested to purchase a firearm. **DOUR** responded using a number known to CHS-1, specifically, **DOUR** used (716) 526-7422 (hereinafter "Target Phone 1"). Law enforcement conducted checks on open-source databases and learned Target Phone 1 is subscribed to and used by **DOUR**. Below is a screenshot of CHS-1's conversation with **DOUR**:




10. Based on my training and experience, involvement in the investigation, and conversations with CHS-1, **DOUR** and CHS-1 used coded language to discuss firearms trafficking. First, CHS-1 asked **DOUR** if **DOUR** could provide CHS-1 with "firepower." Based on my training, experience, and conversations with CHS-1, "firepower" is a reference,

---

CHS-1 is pending prosecution in the Western District of New York. CHS-1 has a prior felony conviction where CHS-1 was sentenced to incarceration for approximately three years. CHS-1's information has proven to be accurate and reliable as was documented by controlled narcotics and firearms purchases conducted on behalf of law enforcement on this and other unrelated investigations.

in general, to a firearm. Later in the above conversation, **DOUR** asked CHS-1 to switch to an encrypted phone application such as Telegram or Signal.[2] CHS-1 and **DOUR** eventually moved to Telegram to continue their conversation.

11. Below is a screenshot of the conversation between CHS-1 and **DOUR** on Target Phone 1:







---

[2] As part of the investigation, your Affiant reviewed messages exchanged between **DOUR** and **PURDUE** where they used coded language while discussing the purchase, transfer, and sale of firearms between Ohio and the Western District of New York. **DOUR** and **PURDUE** used the encrypted phone application Telegram during these communications. Law enforcement gathered these messages after executing a search warrant on **DOUR's** seized phone.

12. In the captured screenshots, CHS-1 and **DOUR** discuss the condition and price of the firearm through Telegram. **DOUR** explains to CHS-1 that his source of supply only had one handgun available, but **DOUR** would look into obtaining a rifle for CHS-1. As discussed in more detail below, **DOUR's** source of supply for firearms was **PURDUE**.

13. On August 15, 2025, under the direction of the FBI, CHS-1 conducted a recorded, controlled firearm purchase from **DOUR**. Prior to the meeting, CHS-1's person and vehicle were searched by law enforcement with negative results for contraband. Shortly before the in-person meet, FBI surveillance teams observed **DOUR** meet with an unspecified number of unidentified males in a gold-colored Lincoln SUV bearing Ohio license plate KHD-3314[3] (hereinafter "KHD-3314"). FBI surveillance teams observed CHS-1 and **DOUR** enter KHD-3314 wherein the firearm transaction was completed. After the meeting, FBI surveillance observed CHS-1 exit KHD-3314 and enter his/her vehicle and depart the area. Shortly after departing the area, CHS-1 met with FBI Special Agents who took the aforementioned firearm into custody, depicted below:




---

[3] The gold-colored Lincoln SUV, bearing Ohio license plate KHD-3314 is registered to **PURDUE**, with an associated home address of 685 E. Morrill Avenue, Apartment B, Columbus, Ohio 43207. **PURDUE's** address as reported by the Ohio Department of Motor Vehicles is also 685 E. Morrill Avenue, Apartment B, Columbus, Ohio 43207.

14. Based on conversations with CHS-1 and a review of the recorded meet, two other African American males were in the vehicle. Law enforcement later identified one individual as **PURDUE**. CHS-1 confirmed **PURDUE** handled and provided CHS-1 with the firearm. According to CHS-1, **DOUR** brokered the firearms deal for a fee.

15. A review of **DOUR's** and **PURDUE's** cellular communications, gathered via the execution of a search warrant on **DOUR's** phone, reveal that prior to and on August 15, 2025, they communicated as to the purchase/sale of firearms and ammunition.

16. On October 3, 2025, CHS-1 contacted **DOUR** at Target Phone 1, asking to purchase additional firearms. Below is a screenshot of the conversation between CHS-1 and **DOUR**, provided to law enforcement by CHS-1:



17. Once again, CHS-1 and **DOUR** used coded language to discuss firearms trafficking. In this instance, CHS-1 ask **DOUR** if **DOUR** had additional "tools" around. Based on my training and experience, and conversation with CHS-1, "tools" is a reference, in general, to firearms. **DOUR** informed CHS-1 that his source of supply, whom your Affiant believes to be **PERDUE**, was out of town, however, **DOUR** had "little boyz" around. Based on my training and experience, involvement in the investigation, and conversations with CHS-1, "little boyz" was a reference to handguns.

18. The investigation into **PURDUE**, including a review of **PURDUE's** social media accounts and communications with **DOUR**, revealed **PURDUE** appearing in multiple photographs and videos with firearms to include handguns and long rifles. Based upon a review of open-source social media checks, **PURDUE** has and continues to appear in photographs flaunting and advertising various kinds of firearms dating back to November 2024.

19. Based on my training, experience, and involvement in the investigation, **PURDUE** is showcasing firearms on social media for potential sale, a tactic used by firearm traffickers.

20. On October 12, 2025, after a review of **PURDUE's** publicly shared Facebook account, law enforcement captured the following screenshots from **PURDUE's** Facebook account, depicting four (4) suspected pistols (one of which has a suspected attached extended magazine) and one (1) AR-15-style pistol, commonly referred to as an "ARP":







21. In or around February 2026, CHS-1 contacted **DOUR**, asking to purchase additional firearms. **DOUR** subsequently provided CHS-1 with a picture of a handgun for sale and discussed the price of the handgun through Telegram. Under the direction of the FBI, CHS-1 agreed to pay $1,300.00 for the handgun. Below is a screenshot of the conversation between CHS-1 and **DOUR**:




22. Later that day, using Target Phone 1, **DOUR** texted CHS-1 to offer an additional firearm for $850.00. Below is a screenshot of the conversation between CHS-1 and DOUR:




23. As seen in the above screenshot, which was provided to law enforcement by CHS-1, **DOUR** provided CHS-1 with a picture of the second handgun for sale and discussed the price of the handgun through Telegram. Again, under the direction of the FBI, CHS-1 agreed to pay an additional $850.00 for the aforementioned handgun for a total of $2,150.00 for the two handguns.

24. On February 27, 2026, **DOUR** instructed CHS-1 to meet at 185 Plymouth Avenue, Buffalo, New York 14213 (hereinafter "185 Plymouth"). As CHS-1 arrived at 185 Plymouth, FBI surveillance teams observed **DOUR** exit 185 Plymouth and enter CHS-1's vehicle. After a brief conversation with CHS-1, **DOUR** exited CHS-1's vehicle, walked

eastbound, turned onto Porter Avenue, and then entered KHD-3314. Shortly thereafter, **DOUR** exited KHD-3314, walked back to Plymouth Avenue and entered CHS-1's vehicle wherein the firearms transaction was completed after CHS-1 paid **DOUR** $2,150.00. Upon departure, CHS-1 met with FBI Special Agents who took the aforementioned firearms into custody. Below is a photograph of the aforementioned firearms:




25. A review of **DOUR's** and **PURDUE's** cellular communications reveal that on February 26, 2026, a day prior to the controlled purchase of the above-depicted firearms, they were in communication.

26. An ATF Firearms Trace revealed one of the recovered firearms depicted above was purchased by **PURDUE** on August 21, 2024 under Ohio concealed weapon permit 25FRA084133.

27. On April 9, 2026, CHS-1, under the direction of the FBI, arranged for the purchase of an additional handgun from **DOUR**. CHS-1 arranged to meet **DOUR** in the

vicinity of 185 Plymouth on April 14, 2026, for the controlled purchase. CHS-1 agreed to pay $1,300.00 for the handgun.

28. On April 14, 2026, prior to the controlled purchase, surveillance teams conducted a search of CHS-1's person and vehicle with negative results. Further, CHS-1 was provided $1,300 in government funds and a recording device for the controlled purchase. CHS-1 proceeded with the controlled purchase of the handgun from **DOUR** in and around the vicinity of 185 Plymouth. After the controlled purchase CHS-1 provided law enforcement with the purchased handgun, two (2) 10-round magazines, one (1) 13-round magazine, and seventy-three (73) rounds of 9mm ammunition, depicted below:



29. A review of **DOUR's** and **PURDUE's** cellular communications reveal that on April 9, 13, and 14, 2026, they communicated as to the purchase of the above-depicted handgun, magazines, and ammunition.

30. Between April 15 and April 29, 2026, CHS-1, under the direction of the FBI, arranged for the purchase of a short-barreled rifle from **DOUR**. CHS-1 arranged to meet **DOUR** in the vicinity of 185 Plymouth for the controlled purchase on April 29, 2026. CHS-1 agreed to pay $2,400.00 for the short-barreled rifle.

31. On April 29, 2026, prior to the controlled purchase, surveillance teams conducted a search of CHS-1's person and vehicle with negative results. Further, CHS-1 was provided $2,400 in government funds and a recording device for the controlled purchase. CHS-1 proceeded to met **DOUR** at 185 Plymouth. After meeting **DOUR** at 185 Plymouth, CHS-1 transported **DOUR** to 48 Guilford Street, Buffalo, NY. **DOUR** exited CHS-1's vehicle, entered 48 Guilford, and then re-entered CHS-1's vehicle with the short-barreled rifle. CHS-1 then completed the controlled purchase of the short-barreled rifle with **DOUR**. After the controlled purchase CHS-1 provided law enforcement with the short-barreled rifle, two (2) magazines, and multiple rounds of 5.56 caliber ammunition, depicted below:



32. A review of **DOUR's** and **PURDUE's** cellular communications reveal that in the approximate two weeks leading up to the controlled purchase of the above-depicted short-barreled rifle, they communicated as to the purchase of the above-depicted short-barreled rifle.

33. On June 3, 2026, CHS-1 informed your Affiant that CHS-1 has observed **DOUR** to be in possession of more than one cellular device. Based on my training, experience, and conversations with other law enforcement officers, I have learned that firearms traffickers and their co-conspirators frequently communicate with each other utilizing a "dirty" phone. When using the term "dirty" phone, your Affiant is referring to a cellular telephone primarily, if not exclusively, used to facilitate illegal activity between co-conspirators at risk of arrest and prosecution. It is also common for firearms traffickers to utilize multiple cellular telephones. I know this method to be utilized by individuals engaged in firearms trafficking as an inexpensive attempt to avoid detection of law enforcement.

34. On June 18, 2026, pursuant to a federal search warrant authorized by the Honorable Magistrate Judge Jeremiah J. McCarthy, the FBI searched **DOUR** and seized Target Phone 1 from his person. Later that day, the FBI interviewed **DOUR** who confirmed that Target Phone 1 belonged to him and that the associated phone number was (716) 526-7422.

35. On July 7, 2026, pursuant to a federal search warrant authorized by the Honorable Magistrate Judge Michael J. Roemer, the FBI reviewed data stored on Target Phone 1. A review of Target Phone 1 revealed conversations between **DOUR** and "Stacks

Black Fam," phone number (716) 579-0698,[4] associated with **PURDUE**. From May 2025 through June 2026, **PURDUE** discussed selling and building firearms to sell to and with **DOUR**. Of note, three of the firearm photos observed in the chat were images shared with CHS-1 and later recovered from CHS-1 after the aforementioned controlled buys. Below are some of images observed:










36. During the course of this investigation, **DOUR** became aware CHS-1 was a convicted felon based upon representations made by CHS-1 and others. As such, **DOUR** knew or had reasonable cause to believe that the use, carrying, and possession of a firearm by CHS-1 constituted a felony in violation of Title 18, United States Code, Section 922(g)(1), and violations of New York State Law, which would also constitute felonies. In addition, both **DOUR** and **PURDUE** knew or had reasonable cause to know that CHS-1 was not

---

[4] A review of subscriber records revealed telephone (716) 579-0698 is registered to **PURDUE**.

licensed to deal, import, manufacture, and collect firearms, and that CHS-1 was receiving the firearms in New York State and the firearm had been purchased outside the state. As such, **DOUR** and **PURDUE** both knew or had reasonable cause to believe that the use, carrying, and possession of a firearm by CHS-1 constituted a felony in violation of Title 18, United States Code, Section 922(a)(3).

37. **IT IS FURTHER REQUESTED** that the complaint and this affidavit, as it relates to an ongoing investigation, until further order of the Court in order to avoid premature disclosure of this investigation, guard against the defendant's potentially fleeing, and to do better to ensure the safety of the agents and others, except that working copies should be made available to the United States Attorney's Office, FBI, and any other law enforcement agency designated by the United States Attorney's Office.

## CONCLUSION

38. **WHEREFORE,** based upon the foregoing, there is probable cause to believe that **DOUR** and **PURDUE** have violated Title 18, United States Code, Sections 933(a)(1) and 933(a)(3) (conspiracy to commit trafficking in firearms).

Ralph Joseph
RALPH JOSEPH
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed to and sworn to telephonically
This ~~9th~~ 13th day Of October, 2026

Michael J. Roemer
HONORABLE MICHAEL J. ROEMER
UNITED STATES MAGISTRATE JUDGE